96 F.3d 1449
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Olee Wonzo ROBINSON and Michelle West, Defendants-Appellants.
 No. 94-1538, 94-1727.
 United States Court of Appeals, Sixth Circuit.
 Sept. 5, 1996.
 
 Before: NELSON, MOORE, and COLE, Circuit Judges.
 OPINION
 MOORE, Circuit Judge.
 
 
 1
 Defendants challenge their convictions for various drug-related offenses, including conspiracy to distribute cocaine, money laundering, engaging in a continuing criminal enterprise, and drug-related homicide. Despite a lengthy trial below and numerous issues on appeal, we discern no basis for reversal. We affirm the district court's judgment.
 
 I. BACKGROUND
 
 2
 Defendants Olee Wonzo Robinson and Michelle West were the central figures in a sizable drug and money-laundering conspiracy in Southfield, Michigan. For a number of years, Robinson operated a car-leasing business in which West was an employee. As part of this "business," Robinson used false information to set up paper companies through which luxury cars, apartments, and even a Cessna airplane were obtained for his drug-dealing clientele and himself. Apparently, by channeling drug proceeds into financing arrangements for Range Rovers, Porsches, and similar cars, Robinson's operation managed to launder millions of dollars of drug money. Defendants also dealt cocaine directly in enormous quantities. According to government witness Anthony Bowling, West once showed him between 100 and 150 kilograms of cocaine in the trunk of her car. J.A. at 477. According to Edward Osborne, another witness, Robinson had him make frequent interstate trips to deliver and receive drugs. From California alone, Osborne estimated that a total of 200 to 250 kilograms of cocaine had been obtained in Robinson's behalf. J.A. at 1084.
 
 
 3
 In April 1989, Robinson and West were leaving their office when they were robbed at gunpoint of over $24,000. It turns out that the robber was someone they knew: Sherman Christian, another drug dealer and occasional boyfriend of West's friend, Cynthia Horry. Robinson soon responded by hiring Osborne (his trusted drug courier) and at least two others to find Christian and kill him, and Robinson paid the expenses and supplied the weapons needed to carry out the ultimate deed. After considerable searching, Osborne and his associates finally located Christian in June 1989. They followed his van on the highway, drew alongside it, and fired their guns into his side. Not only were they successful, their brutal act made the evening news. While watching the news on TV at Bowling's home, Robinson remarked to Bowling, "I told you I was going to get that [expletive deleted], didn't I[?]" J.A. at 510.
 
 
 4
 Christian's death satisfied not only the defendants' retributive instincts, but also their pocketbooks. West had previously arranged for Cynthia Horry to have Christian's life insured with Sun Life of Canada. Although the original beneficiaries on this policy had been Horry and her daughter (who was also Christian's daughter), the beneficiaries were soon changed under suspicious circumstances. The first attempt to make the change failed. On the second attempt, the policy was made payable to West as trustee for Christian's children (including Christian's son by his ex-wife, Deborah Christian). Deborah Christian promptly challenged the arrangement, once she learned about it, asserting that the letter from her lawyer which purportedly acceded to the arrangement was a fraud. This dispute was eventually settled, with Deborah Christian and West dividing the proceeds equally. Not coincidentally, the witness on the change-of-beneficiary form had been Robinson, and Sherman Christian's signature on the form was later identified at defendants' trial as a forgery. At trial, the government also presented evidence showing that West had funneled her share of the insurance proceeds back into her illegal operations with Robinson.
 
 
 5
 In May 1993, federal authorities searched the defendants' homes and business premises pursuant to a warrant. Hundreds of items were seized, and many of these items were eventually admitted at trial. Although Robinson moved to suppress the evidence, arguing that the search warrant had not been supported by probable cause, the district court denied this motion.
 
 
 6
 While incarcerated and awaiting trial, West reportedly received threatening letters and phone calls from Robinson. Though West later denied being worried about the threats, the administrator of the jail testified that he had seen West in tears, expressing great concern over the safety of her daughter. J.A. at 1527-28, 1373-77. Upon further investigation, the FBI obtained a search warrant and went through the papers in her cell, under protest by West. West claimed in a subsequent evidentiary hearing that the FBI had violated her Sixth Amendment right to counsel by viewing confidential, attorney-client communications. The government responded that the officials had studiously avoided all privileged documents--including all papers with her attorney's letterhead--and had looked only for evidence of Robinson's threats. In addition, West had not demonstrated any prejudice. The district court denied relief on this claim.
 
 
 7
 Four days before the commencement of trial, the government amended Count Six of the indictment, which had charged West with laundering drug proceeds through payments on a 1989 Honda Civic. The indictment had previously described her actions as consisting of a $1,600 down payment on the Civic. When investigators learned that the "down payment" was really only a rebate, the government changed the indictment to state that West had made installment payments totalling $2,514.40. West objected to this last-minute amendment, and the district court seemed inclined to agree that the timing was somewhat unfair. However, the district court postponed its ruling on West's motion to sever/dismiss until the following week, telling the government, "So I'll leave it up to you to convince me between now and next Monday that [s]he's not been prejudiced. I don't know how you're going to do it." J.A. at 1538. It appears that the issue was not revisited the next week. Later in the trial, West's attorney reminded the court that it had not yet ruled on the motion. The court then summarily denied the motion.
 
 
 8
 The trial itself began on November 9, 1993 and lasted until December 22, 1993. On the final day, during jury deliberations, the foreperson sent a note to the court with a single question: "Could you please further clarify what constitutes 'drug-related' in Count 3[?]" J.A. at 405. After consulting with the parties, the court responded, "In answer to your question above, I refer you to subparagraph (C) on page 38 of the Instructions as well as subparagraphs (A) and (B) on the same page." J.A. at 405. Subparagraph (C) on page 38 set forth the third necessary element for finding defendants guilty under 21 U.S.C. § 848(e)(1)(A):
 
 
 9
 (C) Third, that the defendant took these actions while engaging in or working in furtherance of either a continuing criminal enterprise or a conspiracy to distribute over 5 kilograms of cocaine.
 
 
 10
 Working in furtherance of a continuing criminal enterprise or a conspiracy means to intentionally do any act or take any action to achieve the purposes of the continuing criminal enterprise [or the] conspiracy.
 
 
 11
 J.A. at 240-41. In other words, the court explained "drug related" to the jurors by specifically directing them to the language, "engaging in or working in furtherance of." The defendants did not object.
 
 
 12
 Robinson and West were ultimately convicted as charged. Specifically, West was convicted of conspiracy to distribute controlled substances (21 U.S.C. §§ 846, 841(a)(1), & 841(b)(1)(A)), drug-related homicide and aiding and abetting in drug-related homicide (21 U.S.C. § 848(e)(1)(A) & 18 U.S.C. § 2), making false statements to a federally insured institution (18 U.S.C. § 1014), and laundering of monetary instruments (18 U.S.C. § 1956). Robinson was convicted of the same offenses, plus: engaging in a continuing criminal enterprise (21 U.S.C. § 848), being a felon in possession of firearms (18 U.S.C. 922(g)(1)), structuring financial transactions to evade reporting requirements (and aiding and abetting in the same) (31 U.S.C. § 5324 & 18 U.S.C. § 2), and aiding and abetting the distribution of controlled substances (21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2). JA at 84-96, 187-91. Co-defendant Cynthia Horry was also convicted on a few counts, although she was acquitted on the drug-related homicide charge. Horry's appeal was expedited, see United States v. Horry, 49 F.3d 1178, 1179 (6th Cir.1995). Co-defendant Shawn Wimberly remains a fugitive.
 
 II. DISCUSSION
 A. Denial of Robinson's Motion to Suppress
 
 13
 Robinson begins his brief with one of his least plausible claims: that the warrant used to search his home and business was not supported by probable cause. Robinson's contention here is actually twofold: first, there was no evidence specifically linking his residence to any alleged drug activities and therefore no grounds to search the residence for drug evidence; second, there was no basis for searching his current business premises because all of the asserted illegal activities occurred before he moved into these premises. In general, the role of this court in such cases is simply to "determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." United States v. Canan, 48 F.3d 954, 958 (6th Cir.1995) (quoting Massachusetts v. Upton, 466 U.S. 727, 728 (1984)), cert. denied, 116 S.Ct. 716 (1996). Stated somewhat differently, we affirm if "we believe that the magistrate had 'a substantial basis for concluding that a search would uncover evidence of wrongdoing.' " Id. at 958-59 (quoting United States v. Leake, 998 F.2d 1359, 1363 (6th Cir.1993)). We believe such a substantial basis exists here.
 
 
 14
 First, the magistrate judge issued the warrant based on a 20-page affidavit, which detailed numerous instances of drug dealing and money laundering by Robinson and his associates. Although none of the instances was specifically tied to Robinson's home, the affiant--an FBI special agent--relied upon his 17 years of law enforcement training and experience, including the execution of over 100 search warrants in narcotics cases, to conclude that it was reasonably likely that evidence of cocaine trafficking would be found in Robinson's home. According to the affidavit, those who sold drugs would "often keep records of these sales in their residences, garages, where they work, and motor vehicles." Reinecke Aff. at 18-19, J.A. at 168-69. The law is well established that search warrant affidavits may contain conclusions based on an affiant's training and experience, especially where those conclusions relate to the possibility of finding drug evidence at a drug dealer's home. See, e.g., United States v. Caicedo, 85 F.3d 1184, 1193 (6th Cir.1996) ("reasonable to defer" to officer's assessment of probability of finding drug paraphernalia in defendant's home, where officer had spent 15 years in law enforcement and at least seven of those years in narcotics investigations); United States v. Martin, 920 F.2d 393, 399 (6th Cir.1990) (appropriate to rely on FBI agent's experience that cocaine distributors frequently keep certain items at home). In light of the ample evidence of illegal drug activity by Robinson, the magistrate's decision to permit a search of his home was clearly supported by substantial evidence.
 
 
 15
 Second, Robinson suggests that all of the illegal activities cited in the affidavit preceded his move to new business quarters, but this is simply untrue. The April 30, 1993 affidavit alleges a continuing pattern of illegal acts from 1987 to April 1993. Thus, even if some of the evidence relating to activities in the old office was "stale," as Robinson contends, that does not necessarily negate the existence of probable cause. See United States v. Henson, 848 F.2d 1374, 1381-82 (6th Cir.1988) (quoting Emery v. Holmes, 824 F.2d 143, 149 (1st Cir.1987): "Where recent information corroborates otherwise stale information, probable cause may be found."), cert. denied, 488 U.S. 1005 (1989). Furthermore, there is no reason to think that the information relating to conduct before the time of Robinson's move was stale. The affidavit pointed to the probability of finding documents, tapes, disks, and other records of ongoing drug trafficking and money laundering at his office. The mere fact that Robinson changed his office location does not mean that these records were likely to have suddenly vanished. It would have been equally (or more) reasonable to suppose that Robinson retained his files, especially since many of these files presumably contained financial documentation for automobiles still used by Robinson's customers. In addition, the ongoing nature of Robinson's activities greatly diminished any danger of staleness, as the evidence from the late 1980s constituted an integral part of the pattern of conduct extending to the time of the affidavit. As this court has already recognized, "[I]nformation which demonstrates a chain of related events covering a broad span of time continuing to the current period may furnish a most reliable indicia of present activity, thereby clearly demonstrating that probable cause exists for the order to intrude." Id. at 1382 (quoting United States v. Haimowitz, 706 F.2d 1549, 1554-55 (11th Cir.1983), cert. denied, 464 U.S. 1069 (1984)). In short, there was a substantial basis for allowing the search of Robinson's current office.
 
 B. The "Duplicitous" Indictment
 
 16
 Robinson next asserts that Count Two of the indictment was "duplicitous" (or duplicative), because it charged both a drug conspiracy and a money-laundering conspiracy. This argument is also without merit. It is true that a duplicitous charge gives rise to the danger of a non-unanimous verdict, as some jurors might be persuaded to convict based on only one of two offenses in a charge, and some other jurors might convict based on the other offense. See United States v. Duncan, 850 F.2d 1104, 1108 n. 4 (6th Cir.1988). However, it cannot be said that the charge here was duplicitous in any respect.
 
 
 17
 Count Two of the indictment stated, in relevant part:
 
 
 18
 That from approximately 1987 until May 1993, in the Eastern District of Michigan and elsewhere, OLEE WONZO ROBINSON, a/k/a Olee Wonzo, a/k/a Wonzo Robinson, MICHELLE WEST, CYNTHIA HORRY, and SHAWN EUGENE WIMBERLY, defendants herein, did knowingly, intentionally and wilfully conspire, combine, confederate and agree with each other and other persons to distribute cocaine, a Schedule II controlled substance.
 
 
 19
 In furtherance of this conspiracy, OLEE WONZO ROBINSON and MICHELLE WEST organized the distribution of hundreds of kilograms of cocaine in the Eastern District of Michigan and elsewhere. OLEE WONZO ROBINSON and MICHELLE WEST created or used companies to give the appearance of legitimacy to their organization.... CYNTHIA HORRY and SHAWN EUGENE WIMBERLY assisted in the acquisition of cocaine for distribution by members of the conspiracy.
 
 
 20
 In furtherance of the conspiracy, various financial institutions and other organizations were provided with false statements, including false employment, earnings, and identifying information, from the purported companies created or used by members of the conspiracy, partially listed above. These false statements were provided by and for members of the conspiracy and other narcotics traffickers to acquire expensive motor vehicles, homes and other items on credit, thereby concealing the illegal source of these trafficers' income.
 
 
 21
 J.A. at 85-86, 216-17. As should be apparent from the foregoing language, Count Two charged a drug conspiracy, not a money-laundering conspiracy, even though it alluded to money laundering and drug distribution as acts "[i]n furtherance of the conspiracy." According to Robinson, the count was confusing to the jury, because it allowed the crime to "be proved by evidence of an agreement to distribute controlled substances, or evidence of false documentation and money laundering, or evidence of a conspiratorial agreement to produce false documents or launder proceeds." Robinson's Br. at 19 (emphasis added). This is incorrect. There was nothing in the language of Count Two to lead the jury to believe that an affirmative finding of money laundering would be sufficient, by itself, to convict on the charge of conspiracy to distribute cocaine. Acts of money laundering were merely presented as a part of the conspiracy, as evidence of conduct "[i]n furtherance of the conspiracy." As recognized by this court in United States v. Todd, 920 F.2d 399, 406 (6th Cir.1990), "Money-laundering is an act integrally related to the success of a conspiracy to distribute drugs." Yet, "evidence of money-laundering alone is not sufficient to link a person who launders money with a conspiracy to violate narcotics laws." Id.
 
 
 22
 To forestall any possibility of juror confusion, the district court specifically instructed the jury with respect to Count Two as follows:
 
 
 23
 The indictment charges that the defendants were all members of one conspiracy to commit the crime of distributing controlled substances. And that it was part of that conspiracy to provide false documentation from false companies to make purchases and to conceal the income derived from the conspiracy.
 
 
 24
 Some of the defendants may well take the position that there was not one conspiracy, but that there were two or more separate conspiracies. [To] Convict any one of the defendants of the conspiracy charged, the Government must convince you beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment.
 
 
 25
 Proof that a defendant was a member of some other conspiracy is not enough to convict. But proof that a defendant was a member of some other conspiracy would not prevent you from returning a guilty verdict if the Government also proved that he was a member of the conspiracy charged in the indictment.
 
 
 26
 J.A. at 1606-07 (emphasis added). As a result, even if Count Two had been duplicitous, there still would not be reversible error, because the district court's instruction re-emphasized that the relevant offense on which the jury needed to be convinced beyond a reasonable doubt was "conspiracy to commit the crime of distributing controlled substances," and money laundering simply constituted a "part of that conspiracy." Sixth Circuit case law establishes that the remedy for a duplicitous indictment is a curative instruction, see United States v. Robinson, 651 F.2d 1188, 1194 (6th Cir.), cert. denied, 454 U.S. 875 (1981); Duncan, 850 F.2d at 1108 n. 4, and here the district court did give such an instruction. In sum, regardless of whether the indictment itself was duplicitous, reversal is not warranted on this issue.
 
 
 27
 C. Sufficiency of the Evidence: Continuing Criminal Enterprise
 
 
 28
 Robinson argues that the evidence was insufficient to convict him for engaging in a continuing criminal enterprise (CCE), because the government failed to show that there were "five or more other persons with respect to whom [he] occupie[d] a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(c)(2)(A). Reviewing the evidence "in the light most favorable to the prosecution," Jackson v. Virginia, 443 U.S. 307, 319 (1979), we reject Robinson's claim.
 
 
 29
 Robinson concedes on appeal that there was sufficient evidence to show he controlled Edward Osborne (one of his primary drug couriers) and Osborne's sidekick, Charles Bonds, for purposes of § 848(c). Thus, only three other persons need to have been organized, supervised, or managed by Robinson in order for § 848(c)(2)(A) to apply, and they are easily found. First, Osborne was not the only person hired by Robinson to kill Sherman Christian. Carl Burrell, "Little Mike" Abernathy, and Lopez Moore ("Pez") also participated. Burrell dropped out of the job after a short while, but "Little Mike" and "Pez" were there for the actual shooting. As mentioned earlier, Robinson supplied the weapons and paid the expenses and salaries for the mission. Indeed, "Little Mike" complained on at least one occasion of "riding around every day," and he demanded more money from Robinson. J.A. at 1219. As Burrell, "Little Mike," and "Pez" were essentially hired guns, the jury could very reasonably have concluded that they were organized, supervised, or managed by Robinson for the purpose of killing Christian. Although the argument might be raised that the shooting was not a part of the CCE, the jury could have found otherwise, and it apparently did so when it convicted Robinson on the drug-related homicide charge.
 
 
 30
 Additionally, Osborne testified that West, Teresa Sweeney, Devonna Rollins, and someone named "Judy" "all worked under [Robinson's] command" at his office, doing anything he directed. J.A. at 1114. Indeed, Sweeney, Rollins, and someone else named "Rich" were identified as specializing in manipulating documents for money-laundering purposes. Robinson contends that there was no evidence that these office employees knew they were participating in a drug conspiracy. Osborne's testimony is to the contrary, however. At trial, Osborne stated that the entire reason for falsifying these documents was more than apparent to him, even before he became involved in drug trafficking: the customers all had enormous amounts of cash but no legitimate jobs, giving rise to the inference that they were involved in narcotics. In addition, "word of mouth" and personal observation compounded the suspicion that these customers were drug dealers. J.A. at 1093. Certainly, the jury was entitled to infer that Sweeney, Rollins, "Judy," and "Rich" knew the purposes for which they engaged in wholesale forgery for a living. The jury could have decided that Robinson's scenario--in which these workers came to the office, falsified documents all day, and then went home without ever knowing why they did what they did--was the far less probable one.
 
 
 31
 Adding together Osborne, Bonds, Burrell, "Little Mike," "Pez," West, Sweeney, Rollins, "Judy," and "Rich," we count 10 people--undoubtedly more than enough for purposes of § 848(c)(2)(A).
 
 
 32
 D. Unanimity on the Five Persons Controlled Under § 848(c)
 
 
 33
 Closely related to the foregoing issue is Robinson's claim that the district court committed plain error in failing to instruct the jury that it had to agree on the identities of the five CCE supervisees. (Defendant failed to raise this issue at trial.) The law is settled in this circuit that the jury does not need to reach unanimous agreement on the five particular individuals organized, supervised, or managed by the CCE defendant. See United States v. English, 925 F.2d 154, 159 (6th Cir.), cert. denied, 501 U.S. 1210 (1991). Consequently, Robinson's argument rests upon a potential, narrow exception to this rule found in the Ninth Circuit decision, United States v. Jerome, 942 F.2d 1328 (9th Cir.1991).
 
 
 34
 In Jerome, the court held that it was plain error not to give a "specific unanimity instruction" to the jury (i.e., an instruction requiring the jury to agree on five specific supervisees), where the government had erroneously argued to the jury that the defendant had organized certain individuals who could not possibly have been organized by him. Id. at 1330-31. Later, the government even conceded the impossibility. Id. at 1330. Robinson claims that the government did exactly the same thing in the instant case, naming a host of individuals during closing argument over whom he clearly had no control; hence, the failure to give the specific unanimity instruction was plain error.
 
 
 35
 The government responds that this case is distinguishable from Jerome in the same way that United States v. Chalkias, 971 F.2d 1206 (6th Cir.), cert. denied, 506 U.S. 926 (1992), was distinguishable. In Chalkias, the Sixth Circuit emphasized that the Jerome prosecutor's closing argument had asserted that various individuals "could count" as CCE supervisees, even though they concededly could not. The Chalkias prosecutor, by contrast, "simply summarized the evidence and the activities of each individual, never stating that any certain individual was managed" by the defendant. Id. at 1214-15. In other words, because the Chalkias prosecutor never erroneously named any individuals as CCE supervisees, and only "left the question open" for the jury to decide, the specific unanimity instruction was unnecessary. Id. at 1215.
 
 
 36
 A review of the prosecutor's closing argument in the instant case reveals, however, that it was much more similar to the Jerome closing argument than the one in Chalkias. Rather than leave "the question open," the prosecutor here was far more direct. He first asked the jury rhetorically, "Were there five or more people involved in this organization?" He then listed the names of 20 people. And finally, he ended by stating, "These are just some of the people that are referred to by the witnesses that are involved. Clearly there's five or more people that are involved." J.A. at 1634. Because the sole significance of the "five or more" question was to determine whether § 848(c) was applicable to Robinson, the prosecutor here, like the Jerome prosecutor, essentially asserted that these mentioned individuals "could count" for CCE purposes. Because the government's closing had little in common with the closing in Chalkias, the government's reliance on the distinction in that case seems misplaced and cannot be accepted.
 
 
 37
 Nevertheless, Robinson's claim still faces a significant obstacle. The Sixth Circuit in Chalkias directly disagreed with at least part of Jerome 's holding, stating, "We also decline to adopt the view that failure to give an instruction setting out the persons that could not be considered to have been managed by a CCE defendant is per se plain error. Instead, we examine the instruction in the context of the case as a whole." 971 F.2d at 1215. Viewing the instant case "as a whole," we should note that there exists another potential distinction between it and Jerome. In Jerome, the government had referred in closing argument to individuals for whom defendant's organization/supervision would concededly have been logically impossible--they were only "the suppliers of his suppliers" in the drug distribution chain. Jerome, 942 F.2d at 1330. In this case, on the other hand, there was nothing in the evidence to indicate that the 20 individuals named by the assistant U.S. attorney were necessarily precluded from having been organized/supervised by Robinson. Robinson only argues now that the evidence was insufficient to show they were controlled by him--that they were mainly buyers or suppliers. This seems to be a distinction with a difference. It shows that the prosecutor here did not lead the jury astray by naming persons who could not logically have been organized by Robinson; he only named persons for whom the evidence was consistent with possible organization/supervision but may or may not have been sufficient. In other words, extending Jerome 's exception to the instant case, as Robinson would have us do, would be extending it quite far. It would require a district judge to listen especially carefully to a prosecutor's closing argument in a CCE case, identify all individuals named as possible supervisees during that argument, apply (mentally) a sufficiency analysis to each of those individuals, and then sua sponte instruct the jury with a "specific unanimity instruction" if the evidence appears to have been insufficient on any one of those individuals (and if defendant fails to object). This appears to be quite a burden to place on district courts. We can imagine a resulting situation in which trial judges, in order to avoid the danger of reversal on this narrow ground, might try to err on the side of caution and give the specific unanimity instruction in every CCE case. Decisions like United States v. English, which do not normally require specific unanimity in a jury's CCE verdict, would then be reduced to a hollow shell.
 
 
 38
 Our reluctance to adopt and extend Jerome in this manner is supported by this court's decision in United States v. Phibbs, 999 F.2d 1053, 1087 (6th Cir.1993), cert. denied, 510 U.S. 1119 (1994), in which the evidence had been found to be insufficient as to one individual named by the government as a possible CCE supervisee, yet the court ruled that "the government did not mislead the jury concerning who, as a matter of law, could be deemed to be a supervisee of [defendant's]." In the court's view, erroneous mention of the individual did not lead to "undue confusion," id., and the jury "was not categorically misinformed ... as was the jury in Jerome." Id. at 1087 n. 17. In light of the court's finding of no reversible error in Phibbs, we are hard-pressed to find plain error in the instant case, where defendant alleges only that the evidence was insufficient as to some of the named individuals. Even if we assume that the evidence was insufficient as to these individuals, and even if we assume that the prosecutor's closing argument was misleading or confusing for this reason, the fact that several individuals were erroneously named, instead of just one, does not make the argument materially more misleading or confusing than the one in Phibbs. We hold that there was no plain error in allowing the jury to reach a verdict on the standard, non-specific CCE instruction in this case.
 
 
 39
 E. Sufficiency of the Evidence: Drug-Related Homicide
 
 
 40
 Both Robinson and West assert that the evidence was insufficient to convict on the charge of killing in furtherance of a continuing criminal enterprise or while engaging in an offense punishable under § 841(b)(1)(A). With respect to Robinson, resolution of this issue is straightforward. With respect to West, her conviction is easily upheld as an aider and abettor to Robinson.
 
 
 41
 Robinson begins his claim by contending that Christian's murder in June 1989 could not have been committed while he was working in furtherance of a CCE, because the evidence only showed him engaging in drug dealing after that date. In reality, however, the evidence Robinson cites is indeterminate (at best) as to the period of his direct involvement in drug trafficking. Anthony Bowling testified that he started selling drugs for Robinson in either 1987, 1988, or 1989, but he was unable to pin down a date despite repeated questioning. J.A. at 469, 482-84, 535-39. Edward Osborne testified that he started delivering drugs for Robinson "around 1989" but could not specify a month. J.A. at 1034. What seems much clearer, however, is that Bowling's testimony did indicate an established drug relationship with Robinson by the time of Christian's death. Bowling estimated that he had dealt with Robinson a total of "[a]bout eight to ten times" in cocaine transactions, but after the shooting, he only dealt with Robinson and West "maybe one or two" times. J.A. at 494, 515. Moreover, Edward Osborne explicitly recounted post-robbery/pre-homicide conversations with Robinson in which Robinson had complained that West must have told Cynthia Horry "about the money or the drugs" because that was the only way Christian would have known how to rob them. J.A. at 1212-14. Robinson supposedly explained to Osborne that he had had "$4,000 or $5,000 in his briefcase," West had had $20,000 from having just sold a kilogram of cocaine, and there were an additional four kilograms of drugs which Robinson had directed West to leave in the car (and which Christian had not ended up taking). Viewing this evidence in the light most favorable to the government, we find it was entirely permissible for the jury to conclude, beyond a reasonable doubt, that not only Christian's execution, but also the robbery itself, took place during a period of active engagement by Robinson in ongoing drug activities. Indeed, no one disputes that West was heavily involved in drug trafficking, and West--according to Osborne--was clearly under Robinson's "command" at work. J.A. at 1114.
 
 
 42
 Robinson also contends that killing Christian could not have been in furtherance of the CCE because the alleged motives for it were unrelated to drug trafficking. As Robinson sees it, the government's evidence showed only that the defendants were bent on getting two things: revenge for the robbery and insurance proceeds; therefore, furthering the CCE could not also have been a motive. There are a number of obvious problems with this view. For one thing, it supposes that defendants were only capable of holding two motives at once rather than three. For another, it ignores the government's suggestion at trial that Christian's death served the additional purpose of warning others not to stir any trouble with Robinson's drug organization. Given that Christian had been a rival drug dealer who had directly robbed defendants of drug proceeds, this was not an unreasonable hypothesis, and it would have been a rational inference for the jury to make at trial. Finally, Robinson's argument regarding the insurance policy appears to assume that the money collected on the policy could only have been an end in itself, rather than another means of furthering the CCE. At trial, the government presented circumstantial evidence that the insurance proceeds paid to West were ultimately used to support further drug activities, through investment into Robinson's business and payments on Robinson's Cessna airplane. J.A. at 663-72, 985-86. In other words, Robinson's insurance-related motive for killing Christian may well have included the motive of using that money to further the CCE. Payments on the Cessna would have been one of the most direct ways to further the drug distribution enterprise, as the airplane was an important means of conducting defendants' business.
 
 
 43
 In summary, there was more than sufficient evidence to support the jury's determination that Robinson participated in killing Christian while "working in furtherance of a continuing criminal enterprise." 21 U.S.C. § 848(e)(1)(A).
 
 
 44
 West also actively contributed to killing Christian. She engaged in discussions to plot Christian's execution. On one of the occasions in which Osborne and his associates needed more money while hunting Christian, they received it from West instead of Robinson. West was also instrumental in the plan to obtain insurance proceeds. Under the circumstances, there was undoubtedly sufficient evidence to show she aided and abetted Robinson under 18 U.S.C. § 2.[1]
 
 
 45
 F. Failure to Give Supplemental Instruction on "Drug-Related Murder"
 
 
 46
 Defendants argue that it was plain error not to give a supplemental instruction to the jury when it asked for clarification as to the meaning of "drug-related." This argument must fail because the district court's answer was an appropriate response. The jury asked about a phrase--"drug-related murder"--that was not really a part of the statutory offense but merely shorthand for a more cumbersome description--i.e., killing while "engaging in or working in furtherance of a continuing criminal enterprise, or [while] engaging in an offense punishable under section 841(b)(1)(A)." 21 U.S.C. § 848(e)(1)(A). The court's answer properly directed the jury back to the part of the instruction dealing with this more cumbersome description. Thus, unlike the situation in United States v. Nunez, 889 F.2d 1564 (6th Cir.1989), the jury's inquiry in this case was "fully covered in the court's instructions," and "a reference to or rereading of the instructions" did "suffice." Id. at 1569. The court merely had to explain that "drug-related" meant the same thing as what the instruction already stated in "subparagraph (C) on page 38 of the Instructions." J.A. at 405. The court made explicit a link between two parts of the jury instruction that may not have been adequately linked before. Certainly, there was nothing approaching plain error in this.
 
 
 47
 G. Sixth Amendment Violation in the Search of West's Jail Cell
 
 
 48
 West argues that the FBI search of her cell violated her Sixth Amendment right to counsel because it "invaded" documents subject to the attorney-client privilege. There are two major problems with this argument: (1) the FBI official in charge testified that no attorney-client materials had been touched; and (2) even if there had been an intrusion into privileged materials, West was unable to show any resulting prejudice.
 
 
 49
 Unfortunately, it does not appear that the district court made any factual findings regarding West's Sixth Amendment claim. It just denied the motion. Nevertheless, the defense failed to present any evidence to counter FBI Agent Reinecke's unequivocal testimony that all attorney-client documents were avoided. On appeal, too, West's Sixth Amendment arguments are predicated upon mere supposition as to the types of documents the FBI agents might have seen. In the absence of any evidence to the contrary, the district court was certainly entitled to credit the government's assertion that it did not view any privileged materials during the search.
 
 
 50
 Furthermore, even if we assume that the searching officers did view confidential information, as alleged by West, we are still unable to find any reversible error. West cannot point to any privileged information derived from the search that was used at trial, with the possible exception of the information regarding her "down payment" on the Honda Civic (later revealed to be a rebate).[2] As a result, an application of the factors set forth in United States v. Steele, 727 F.2d 580, 585-86 (6th Cir.), cert. denied, 467 U.S. 1209 (1984), leads us to the conclusion that there was no Sixth Amendment violation. In Steele, the court followed the path laid down by the Supreme Court's opinion in Weatherford v. Bursey, 429 U.S. 545 (1977), identifying four relevant factors to the Sixth Amendment inquiry:
 
 
 51
 1) whether the [intrusion] was purposely caused by the government in order to garner confidential, privileged information, or whether the [intrusion] was the result of other inadvertent occurrences; 2) whether the government obtained, directly or indirectly, any evidence which was used at trial as the result of the ... intrusion; 3) whether any information gained by the ... intrusion was used in any other manner to the substantial detriment of the defendant; and 4) whether the details about trial preparations were learned by the government.
 
 
 52
 In this case, the ostensible purpose of the government's search was not to obtain confidential information, only to investigate alleged threats by Robinson; as already noted, no privileged information from the search was used at trial, aside (possibly) from West's Honda "down payment" defense; it does not appear that privileged information was used in any other manner detrimental to West; and no details of confidential trial preparations were learned (again, apart from the Honda issue). In other words, the only possible prejudice specifically identified by West is the information regarding the Honda down payment. Yet the FBI agent, upon direct questioning by the district court, appeared to satisfy the court that this information was discovered through independent means: discussions with the Honda dealer which had already been scheduled to take place. J.A. at 1389-90. Moreover, it is difficult to see how this information could have had any material impact on the outcome of the trial. The government had informed the district court that the same evidence of money laundering through the Honda was going to be introduced, anyway. J.A. at 1535. Without a more convincing showing of prejudice, we can only affirm the district court's denial of West's Sixth Amendment motion.
 
 
 53
 H. Denial of West's Motion to Sever Count Six
 
 
 54
 West contends that she was denied an adequate opportunity to defend herself against Count Six of the indictment (money laundering through the Honda Civic), first because the government amended the count only four days before trial, and second because the district court misled her into thinking the count would be severed. Neither of these arguments is very convincing.
 
 
 55
 First, as the government points out, the district court's decision to deny defendant a continuance (here, in the form of a severance) is reviewed for an abuse of discretion. United States v. Peters, 15 F.3d 540, 545 (6th Cir.), cert. denied, 115 S.Ct. 219 (1994). Further, in order to demonstrate an abuse of discretion, the defendant must ordinarily show prejudice. Id. West is simply unable to show how the government's short notice affected her defense in any adverse way. Count Six had merely been changed to allege $2,514.40 in installment payments instead of $1,600 in a down payment, and West already had all the financial documents relating to the Honda Civic in her possession. Of course, the government's correction of its mistake regarding the down payment may have damaged West's "defense" that the government had made such a mistake in the first place. But this has nothing to do with the poor timing of the government's amendment. It is significant also that the district court denied defendant's motion at the end of a 1 1/2-month trial. West effectively had more than just four days to prepare a "new" defense to the amended count; she had over six weeks, yet she did nothing to refute the government's case. Under the circumstances, and especially in light of the total absence of prejudice, it can hardly be suggested that the district court abused its discretion.
 
 
 56
 Second, to the extent that West relied on the district court's inclination to grant the motion, such reliance was unreasonable. The district court stated quite clearly that it was leaving room, albeit very little room, for the government to persuade it not to grant the motion. If West's lawyer refrained from preparing a defense on Count Six based on the district court's statements, then he would effectively have been gambling on the government's inability to present a compelling argument to resist the motion. This cannot be an acceptable excuse. West's attorney should not have stood silently by while the government presented its evidence on Count Six, if the only reason for so standing was that he was counting on a severance. Moreover, it is again significant that the district court denied the motion at the end of the trial, after having observed the entire case and having gotten a better idea of whether a severance/continuance on Count Six would have been of any use to West. There is no reversible error to be found here.
 
 
 57
 I. Jury Instruction on Drug-Related Homicide
 
 
 58
 Defendants' final claim is that the district court deviated in two important ways from the terms of 21 U.S.C. § 848(e)(1)(A) when it instructed the jury regarding the drug-related homicide offense: (1) it allowed the jurors to convict if they found the defendants killed (or aided and abetted in killing) Christian while "working in furtherance of" an offense punishable under § 841(b)(1)(A), when in fact the homicide statute only covers defendants who are "engaging in" such an offense; (2) it allowed the jurors to convict if they found that the defendants killed while engaging in a drug conspiracy, when in fact the homicide statute only covers defendants engaged in the actual manufacturing and distribution of drugs.[3]
 
 
 59
 These arguments are certainly worth a second look. Section 848(e)(1)(A) criminalizes killing by "any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title."[4] The "working in furtherance of" phrase thus appears to apply only to continuing criminal enterprises, not offenses "punishable under section 841(b)(1)(A)." So when the district court informed the jurors that they could convict if they found action "in furtherance of" the latter type of offense, it may have been incorrect. Furthermore, § 841(b)(1)(A) prohibits the manufacturing, distribution, and dispensing of certain quantities of certain drugs, not conspiracy to manufacture, distribute, or dispense those drugs--conspiracy is criminalized in § 846. Therefore, when the district court told the jurors they could convict if the defendants engaged in (or worked in furtherance of) a drug conspiracy, instead of an offense punishable only under § 841(b)(1)(A), it may have been mistaken there, too.
 
 
 60
 Nevertheless, we are persuaded that the error, if any, was harmless, at least with respect to Robinson. The jury ultimately convicted Robinson of both engaging in a CCE and conspiring to distribute cocaine, and the conspiracy was a lesser-included offense of the CCE. See Rutledge v. United States, 116 S.Ct. 1241, 1247 (1996) ("[I]t is appropriate to characterize § 846 as a lesser included offense of § 848."). As a result, even if the jury found that Christian's murder was done while working in furtherance of a § 841(b)(1)(A) offense, and even if this, by itself, was not a proper basis for convicting under § 848(e), the jury would necessarily also have found that the killing was done while working in furtherance of a CCE, and this is enough to convict under § 848(e). Similarly, even if the jury found that the killing was done while engaging in or working in furtherance of a drug conspiracy, and even if this, by itself, might have been insufficient, the jury would necessarily also have found that the act was done while engaging in or working in furtherance of a CCE, and this, again, is sufficient. Anything that contributed to the drug conspiracy contributed to the CCE in equal measure. This must be the case, because the CCE in Count One of the indictment expressly incorporated the conspiracy in Count Two as the predicate offense. Because Robinson cannot point to any drug conspiracy for which he was convicted that was not a part of the CCE for which he was convicted, he has at most pointed to harmless error, and we must affirm. See Fed.R.Crim.P. 52(a).
 
 
 61
 The same harmless-error analysis does not apply to West, because she was not charged with working in furtherance of a CCE. Nonetheless, even if the district court might have confused "engaging in," "working in furtherance of," § 841(b)(1)(A), and conspiracy, West may still be convicted as an aider and abettor to Robinson under 18 U.S.C. § 2. For this reason, we have focused our sufficiency analysis in part II.E, supra, on whether West aided and abetted Robinson, rather than whether she participated in the homicide in a more straightforward fashion.
 
 
 62
 In short, assuming arguendo that the district court's jury instructions on drug-related homicide were error, they were harmless error, not plain error. They did not affect the jury's ultimate determination that Robinson acted "in furtherance of a continuing criminal enterprise," and they did not affect the determination that West either directly participated or aided and abetted in Christian's execution.
 
 III. CONCLUSION
 
 63
 Although the defendants have raised a number of questions regarding their criminal convictions, we conclude that reversal is not warranted on any of them. We AFFIRM.
 
 
 
 [1]
 Count Three charged both killing and aiding and abetting in the killing. As explained in part II.I, infra, we believe that West's conviction should be upheld under the latter theory
 
 
 [2]
 According to West, she was prejudiced when the government was allowed to correct its error in the indictment, which had referred to the $1,600 figure as a "down payment." But this information was arguably not even privileged, attorney-client material. The government points out that the document revealing the rebate's true nature had been delivered to West by her mother, who had received it from the car dealer. In addition, as noted below, the government denied that it learned about this error in the indictment through the search, claiming instead that it found out from the car dealer himself, who had already been contacted for an investigative interview
 
 
 [3]
 Robinson has raised this issue for the first time in a supplemental brief to this court. At best, then, we review it only for plain error. See Fed.R.Crim.P. 52(b). West has chosen to adopt all arguments of her co-defendant that might be applicable to her
 
 
 [4]
 § 960(b)(1) pertains to the illegal import and export of drugs--something not relevant to the instant case